IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Bernard Brown,<br><br>     Plaintiff,<br><br>vs.<br><br>Director SCDC; Robert Ward, in their individual capacities; and Robert Bollinger, in their individual capacities,<br><br>     Defendants. | Civil Action No. 8:08-3761-HFF-BHH<br><br>**<u>REPORT AND RECOMMENDATION<br>OF MAGISTRATE JUDGE</u>** |

This matter is before the Court on the defendants' motion for summary judgment [Doc. 29] pursuant to Federal Rule of Civil Procedure 56. The plaintiff has pled claims pursuant to Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1983. The plaintiff contends that his employment was terminated on account of his race and that he was retaliated against for exercising his First Amendment Right to protected speech.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

## **FACTUAL BACKGROUND**

From 1989 until his suspension in September 2006 and his ultimate termination in May 2008, the plaintiff was employed as a correctional officer with the SCDC. (Def. Ex. A, Interrog. No. 17.) For much of the plaintiff's career with the SCDC, he was employed at the Trenton Correctional Institute (TCI) in Edgefield County, South Carolina.

According to the plaintiff, Sergeant Valerie Thomas, an African-American female and correctional officer at TCI, started behaving inappropriately towards him. (Pl. Dep. at 156.) The plaintiff alleges that Thomas began to tell him stories of a graphic sexual nature. Specifically, the plaintiff alleges that Thomas spoke to him for several months about her

sexual exploits, the affairs in which she engaged, and the other people that she dated. (Pl. Dep. at 148, 157-58.) Then, in early 2006, the plaintiff alleges that Thomas offered him sex for money. (Pl. Dep. at 158.) The plaintiff admits that he never reported this inappropriate behavior to his superiors or asked her to stop. (Pl. Dep. at 158.)

The plaintiff's relationship with Thomas came to an end when he visited Thomas' home on August 3, 2006. On that date, the plaintiff alleges that he invited Thomas to lunch, and after she refused to meet him at the restaurant, he accepted her invitation to visit at her home. (Pl. Dep. at 142-43.) The plaintiff alleges that he went to her house to invite her to become a Mary Kay consultant. (Pl. Dep. at 143-44.) According to the plaintiff, however, when he arrived, Thomas was allegedly dressed provocatively, and the plaintiff twice said that she was trying to "tempt" him. (Pl. Dep. at 146-47.) The plaintiff alleges that he told Thomas that he came to give her money for groceries and school supplies. (Pl. Dep. at 150.) Thereafter, they went to an ATM where he withdrew $100.00 and gave it to her. *Id*.

Thomas, however, had a different version of the incident. (Def. Ex. B. at 1.) According to Thomas, the plaintiff, upon arrival at her house, complimented her appearance, and shortly thereafter, "jumped on top" of her, put his hands in her shorts, grabbed her buttocks, tried to touch her vaginal area, pulled off her bra, and sucked on her right breast. *Id*. The plaintiff allegedly only stopped after Thomas asked him to stop and began to cry. *Id*. Thomas reported that Brown apologized and explained that his "lust" overtook him. *Id*. When the plaintiff refused to leave, Thomas agreed to go with him to a grocery store, because it was "the only way [she] felt he would leave [sic] if [she] went to the grocery store." *Id*. at 2. The plaintiff and Thomas both reported that they went to an ATM machine where he withdrew $100.00 to give to her.

Thomas reported the plaintiffs alleged sexual assault to the Richmond County Sheriff's Officer in August 5, 2006. *Id*. at 3. On August 10, 2006, Thomas filed a sexual

2

harassment complaint against Brown, which prompted SCDC to begin an internal investigation of her complaint. (See Def. Ex. D.) The plaintiff was arrested, on Friday, September 8, 2006, for Sexual Battery. (Def. Ex. E.) On Tuesday, September 12, 2006, the SCDC placed the plaintiff on an administrative suspension pending the outcome of the investigation, pursuant to SCDC policy. (Ward Dep at 47, 141-42; Def. Ex F.)

The plaintiff sent a written complaint to the SCDC Employee Relations Branch on or about October 10, 2006, containing numerous generalized complaints that Defendant Warden Bollinger favored white employees over black employees at SCDC. (Ward Dep. at. 53; Def. Ex. J.)

On November 27, 2007, the plaintiff was tried and found not guilty by a jury in Richmond County, Georgia, on the sexual battery charges. (Def. Ex. K.) Following the plaintiff's acquittal, SCDC reinitiated its investigation of the internal complaints filed against him. (Ward Dep. at 74.) On or about April 28, 2008, SCDC concluded its internal investigation. (Def. Ex. L.)

The investigation confirmed certain admissions of the plaintiff, including:

- His admission that Thomas discussed personal and intimate matters with him.

- His statement that Thomas attempted to borrow $600.00 from him, which she offered to repay with sexual favors.

- His admission that he gave Thomas money on at least three (3) occasions.

(Def. Ex. L at 1; Ward Dep. at 105-06.)

Based on the results of the investigation and the plaintiff's admissions, Warden Bollinger requested that the plaintiff's employment be terminated for Unprofessional Conduct; SCDC's Employee Relations Branch and Office of General Counsel concurred

3

with the request. (Ward Dep. at 105-07; Bollinger Dep. at 81-83; Def. Exs. M, N.) SCDC issued a termination letter to the plaintiff, on May 20, 2008. (Def. Ex. O.)

**APPLICABLE LAW**

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position

4

is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## DISCUSSION

### I. Race Discrimination

The plaintiff contends that his employment was terminated on account of his race, in violation of Title VII and not for the reasons the defendants have suggested. He contends that his conduct was punished more severely than that of another white officer of comparable rank.

As the Fourth Circuit has explained, a Title VII plaintiff may "avert summary judgment . . . through two avenues of proof." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (quoting *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (emphasis added). A plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of

5

material fact as to whether an impermissible factor such as race motivated the employer's adverse employment decision. *Diamond*, 416 F.3d at 318. Pursuant to the 1991 Act, the impermissible factor need not have been the sole factor. As long as it motivated the adverse action, the plaintiff can establish an unlawful employment practice. *See* 42 U.S.C.A. § 2000e-2(m). Alternatively, a plaintiff may "proceed under [the McDonnell Douglas ] 'pretext' framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285.

Here, the plaintiff has employed the *McDonnell Douglas* burden-shifting proof scheme. *McDonnell Douglas* requires that an employee first prove a *prima facie* case of discrimination by a preponderance of the evidence. If he succeeds, the employer has an opportunity to present a legitimate, nondiscriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the *prima facie* case drops out of the picture, and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

In *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court reiterated that evidence of pretext, combined with the plaintiff's *prima facie* case, does not compel judgment for the plaintiff, because " [i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 147 (citation omitted). However, the Court also stated that, under the appropriate circumstances, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* It is the plaintiff's burden to create an inference that the defendant's proffered reason is a

pretext for intentional discrimination. *See id.* at 147-48. Pretext analysis does not convert Title VII into a vehicle for challenging unfair--but nondiscriminatory--employment decisions. *Holder v. City of Raleigh*, 867 F.2d 823, 828 (4th Cir.1989). Conclusory allegations, without more, are insufficient to preclude the granting of the defendant's summary judgment motion. *See Ross* v. *Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985) *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

**A.** *Prima Facie* **Case**

The parties agree that to establish a *prima facie* case of discriminatory discipline, the plaintiff must show: (1) that he is a member of a protected class; (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against him were more severe than those enforced against employees outside of the protected class. *See Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002). The parties dispute whether issues of fact have been created as to the third element of the plaintiff's *prima facie* case.

The plaintiff has offered evidence of a white employee, Sergeant Clyde Holmes, who he contends participated in the same kind of conduct as the plaintiff but who was disciplined less severely. It appears undisputed that Holmes groped an Officer Richardson, during working hours, by intentionally touching her vagina and buttocks. (Bollinger Dep. at 43, 89.) Holmes later admitted to the action in a written statement to SLED officers. (Def. Ex. U.) The defendant contends that Holmes does not constitute a relevant comparator because he, and his conduct, are not similarly situated to the plaintiff, or his conduct, in numerous and material respects.

To be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such

7

mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *See Ward v. City of North Myrtle Beach*, 457 F. Supp. 2d 625, 643 (D.S.C. 2006); *see also Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992).

The defendants contend that the plaintiff and Holmes cannot be similarly situated because the plaintiff was a Captain, at all times relevant to this case, which is at least two ranks above Sergeant Holmes and, therefore, it was appropriate for the defendants to hold the plaintiff to higher account. (See Bollinger Dep. at 32.) The defendants further argue that, unlike the plaintiff, Holmes was not the supervisor of his accuser. The plaintiff contends that, nevertheless, both Holmes and the plaintiff held a superior rank to that of their accusers and, in that respect, were comparably situated for the authority they had over them.

The defendant relies on *Pruitt v. Howard County Sheriff's Dept.*, 1996 WL 37031, at *4 (4th Cir. January 31, 1996), for the proposition that some differential in supervisory authority renders individuals not similarly situated. The Court does not find *Pruitt* to especially inform the matter. There, the Fourth Circuit did observe that the discharged individuals "held high supervisory positions." *Id*. But the Court further noted that no other comparators "occupied a position of authority," of *any kind*. *Id*. Here, the plaintiff and Holmes were both superiorly ranking officers to their accusers. Nonetheless, the Court thinks that the two were not similarly situated.

Other circuits have traditionally concluded that differences "in rank alone [are] significant to the determination of whether employees are similarly situated." *Carr v. Wisconsin Dept. of Corrections*, 129 Fed. Appx. 306, (7th Cir. 2005); *see Brillinger v. City of Lake Worth*, 317 Fed. Appx. 871, 876 (11th Cir. 2008); *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) (employees not similarly situated because they had higher rank than plaintiff). But, although an employee's position is relevant to the analysis, employees need not be of the exact same rank to be considered "similarly situated." *See*

8

*Hargett v. Nat'l Westminster Bank*, 78 F.3d 836, 839 (2d Cir.1996) (plaintiff in race discrimination suit compared himself to two employees of lower rank who allowed strippers to perform at business meetings and were disciplined less severely); *see also Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 109 n.7 (2nd Cir. 2010). "Roughly equivalent rank[s]" are sufficient. *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2nd Cir. 2001).

Here, however, the undisputed evidence is that the plaintiff was two ranks higher than Holmes. To compound this dissimilarity, the plaintiff, as stated, was in a supervisory posture to his accuser and Holmes was not. (Ward Dep. at 133.) Supervisors and non-supervisors are not similarly situated. *See Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir.2003); *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994). Of course, in para-military institutions the Court would take notice that rank inherently bestows some authority over subordinates, regardless of whether or not individuals are acting within the context of a direct chain of command. Notwithstanding, the difference in rank plus the absence of a technical chain of command with the accuser, would seem to render Holmes not similarly situated to the plaintiff.

It is appropriate to hold accountable, differently, individuals who hold positions of trust and "greater responsibility" from those who hold less. *Vasquez*, 349 F.3d at 641. The evidence shows that the plaintiff was one of only 5 captains; he supervised 20 officers; and was responsible for the safety of the inmates and the entire institution. (Ward at 33; Bollinger at 88.) Holmes was not. (See id.) By virtue of his rank and direct authority over the accuser, it was appropriate for the defendants to demand more of him and to treat him differently than Holmes.

It also should be noted that the plaintiff's termination was based on numerous incidents related to his relationship with Thomas and his failure to disclose various pieces information, including, but not limited to: Thomas's discussion of personal and intimate matters with the plaintiff; her attempts to borrow $600.00 from him, which she criminally

9

offered to repay with sexual favors; and that he lent Thomas money on at least three (3) occasions. (Def. Ex. L at 1; Ward Dep. at 105-06.) The termination was not simply a product of the defendants disbelieving the plaintiff's version of the alleged sexual assault. The plaintiff's own admissions distinguished his conduct from Holmes and allowed the defendants to view his interaction with Thomas as inappropriate and a failure of duty, apart from any alleged assault.

Moreover, the Court does not think it insignificant that the plaintiff had been previously accused of touching another officer inappropriately, in 2005. (See Def. Ex. L at 2.) The plaintiff dismisses this point as inconsequential insofar as the allegation was not, in fact, reported until after the plaintiff's arrest in 2006. It is not for the Court to judge the credibility of the accusation, itself, only the defendants' right to make distinctions in its respective discipline between employees, based upon it. So long as there is no evidence that the defendants disbelieved the second accusation but held it against the plaintiff, anyway, the fact that it was untimely reported, alone, is not evidence that the defendants did not truly *believe* that the plaintiff had been twice accused of assault and does not disqualify it as a basis for treating the plaintiff differently than Holmes. *See Hawkins*, 203 F.3d at 279 (holding that where an employer provides a legitimate, nondiscriminatory reasons for its actions, "it is not [the Court's] province to decide whether the reason was wise, fair, **or even correct**, ultimately, so long as it was the true reason for [the employer's action]" (emphasis added).); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003). (stating that "it was up to [the plaintiff] to produce evidence showing that Wal-Mart **did not genuinely believe** that she had lifted the $12.65. It is not enough for her to show that the investigators might have **made a mistake** in their conclusion" (emphasis added)).

For all these reasons, the defendants were justified in making a distinction in their discipline between the plaintiff and Homes, as a matter of law and Holmes is not a similarly situated comparator.

Thus, the plaintiff, cannot establish his *prima facie* case of discriminatory discipline/discharge because he has not identified a similarly situated individual, outside the protected class, who was treated differently, nor has he otherwise shown circumstances that would properly give rise to an inference of wrongful discrimination, see *Bryant v. Aiken Reg. Med. Ctrs., Inc.*, 333 F.3d 536, 544-45 (4th Cir. 2003).

The parties have made a sort of artificial bifurcation of the plaintiff's first cause of action for "Race Discrimination" (see Compl. at 2.) They have analyzed it as both a discriminatory discipline and a discriminatory discharge claim. In this case, the discipline, of course, was termination. The Court thinks the distinction is unnecessary and does not amount to two separate claims. The varying formulations of the *prima facie* case in our Title VII jurisprudence is not some indication of different causes of action. Rather, they are differing ways of considering a single type of claim, in this case – disparate treatment. Accordingly, the United States Supreme Court has explained that "[t]he precise requirements of a prima facie case can vary depending on the context and were never intended to be rigid, mechanized, or ritualistic." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (U.S. 2002) (quotations omitted). In other words, whether a claim is characterized as one for discriminatory discipline or for discriminatory discharge, the proof required is the same, namely, evidence of circumstances that would properly give rise to an inference that wrongful discrimination motivated the adverse action, whether discipline or full termination. See *Bryant*, 333 F.3d at 544-45. Oftentimes, *McDonnell Douglas* recognizes that such an inference is most appropriately demonstrated by evidence that similarly situated employees outside the protected class received more favorable treatment. *See White*, 375 F.3d at 295. In that tradition, the parties have applied most of their energy towards establishing that Holmes is a permissible comparator. As discussed, the Court disagrees that he is, and that determination should be largely dispositive of the claim. *See id.*

11

Out of an abundance of caution, however, the Court will consider the fourth prong more liberally. The plaintiff has put forward evidence of alleged discriminatory animus, generally, which presumably creates an inference that wrongful discrimination motivated his termination, specifically. As the defendants detail, that evidence includes:

- three anonymous letters submitted by the plaintiff, over a period from 1999 to 2002, reporting allegations of race discrimination at TCI. He also submitted a letter on October 10, 2006 in conjunction with his grievance of his administrative suspension, in which he accuses the Department of race discrimination. (See Pl. Dep., Ex. 1.)

- Testimony of a Lt. Cybil Brown that favoritism of white employees was a "normal practice" at TCI. (See Brown Dep. at 11-13, 30.)

- The plaintiff alleges that he once heard Defendant Bollinger use the "N-word." (Pl. Dep. at 214-16.)

The failure of this evidence lies in its complete lack of relationship, both in time and content, to the decision to terminate the plaintiff's employment.[1] Accordingly, it is ineffective to raise any sort of inference concerning the role wrongful discrimination played *in the adverse employment* action taken against him – termination. *See Stevens v. Del Webb Communities, Inc.*, 456 F. Supp. 2d 698, 710 (D.S.C. 2006) (co-worker's statement does not raise a genuine issue of material fact "especially in light of the fact that none of [the co-worker's] assertions in any way relate to Plaintiff's termination"); *see also Tinsley v. First Union National Bank*, 155 F.3d 435, 443 (4th Cir. 1998) (co-worker's statement that "management didn't like [plaintiff]" provided no details about "why [plaintiff] was fired" and "simply does not provide any evidence that plaintiff's] termination was causally related to her discrimination charge"); *Fitzgerald v. Ennis Business Forms, Inc.*, 2007 WL 81797, at

---

[1] To be precise and by way of example, the plaintiff's admittedly *anonymous* letters could not have influenced, in any respect, much less a racial one, his termination some 6 years later. *See discussion infra*. Likewise, evidence of favorable treatment to other white individuals, such as Tammy Lamer (Brown Dep. at 58-60) or Officers Crowe and Schultzberger (Pl. Dep. at 184, 282), is not effective because those individuals' conduct was not comparable in any respect and they were not, as far as has been offered, otherwise similarly situated to the plaintiff. *See id.*

12

*4 (W.D. Va. January 08, 2007) ("With regard to the second and fourth elements, the court finds that the plaintiff has failed to allege facts from which the court can infer that *Ennis' employment decisions* were made with a discriminatory motive." (emphasis added)).

The Court would say something more about defendant Bollinger's alleged use the "N-word." (Pl. Dep. at 214-16.) The plaintiff contends that he heard the Warden use this word one time "in a pressure situation" regarding an inmate. (Pl. Dep. at 215-16.) In all the years the plaintiff knew Bollinger, this was the only such occurrence. *See id.* The word was not said to, or about, the plaintiff and was otherwise completely unrelated to any conversation or decision to terminate the plaintiff's employment. This is not effective evidence to satisfy the fourth element of a *prima facie* case, however that element may be articulated. *See Patel v. Midland Memorial Hospital & Medical Center,* 298 F.3d 333, 344 (5th Cir. 2002) (holding that a workplace slur, like "sand nigger" does not provide sufficient evidence of discrimination unless it is related to the plaintiff's protected class, proximate in time to the adverse employment decision, made by an individual with authority over the plaintiff, and related to the employment decision at issue); *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir.2001) ("[T]hough such 'stray remarks' may be material to the pretext inquiry, 'their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or . . . were not related to the employment decision in question, or were made by nondecisionmakers.'"); *Ferguson v. Georgia-Pacific, LLC*, 2008 WL 341493, at *4 (W.D. Va. February 05, 2008) ("Ferguson has produced no evidence of racially motivated conduct by anyone at Georgia-Pacific beyond the single incident five years earlier when Stevens used the "N-word" in her presence. The evidence produced by Ferguson is insufficient to support a prima facie case.")

The Court finds offensive any use of such word. But, its utter lack of connection to the plaintiff or the termination of his employment, makes focus on the alleged slur improvident. As a result, the Court concludes that there is no evidence from which an

13

inference of can be drawn that race was a motivating factor in the termination of the plaintiff's employment.

If the district court disagrees with this recommendation and concludes that Holmes was, in fact, similarly situated, then the plaintiff should be considered to have also produced sufficient evidence of pretext to overcome the defendant's proffer of a legitimate non-discriminatory reason for termination of the plaintiff's employment. *See Reeves*, 530 U.S. at 142-44. "A plaintiff can demonstrate pretext by proffering evidence that similarly situated employees were not fired." *Pence v. Tenneco Auto. Operating Co., Inc.*, 169 Fed. App'x 808, 811 (4th Cir.2006); *Reed v. Town of Williston*, 2010 WL 1409425, at *11(D.S.C. 2010). It is undisputed that the plaintiff was terminated for his conduct and Holmes was not (see Def. Ex. V.) Holmes was given a written warning, probation of 180 days, and a 40 hour suspension. *See id.*

## II. First Amendment Retaliation

The plaintiff has also pled a First Amendment retaliation claim pursuant to 42 U.S.C. § 1983. Specifically, the plaintiff contends that he was retaliated against for having sent anonymous letters to Director Ozmint between 1999 and 2002, and for having sent a letter to the Employee Relations Branch on October 10, 2006, complaining about alleged race discrimination. (Def. Ex. J.)

It is well-settled that to make a *prima facie* case in support of his First Amendment retaliation claim, that the plaintiff must establish four elements: (1) The speech must have been protected expression, meaning that it related to a matter of public concern and was beyond the plaintiff's official duties; (2) the plaintiff's interest in exercising his First Amendment expression right must outweigh the defendants' interest in an efficient workplace; (3) the plaintiff must have been deprived of a valuable benefit or adversely affected in a way that would chill exercise of his First Amendment rights; and (4) there must be a causal relationship between the protected expression and the deprivation or adverse

employment decision. *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 351-52 (4th Cir.2000) (listing elements). "[T]he first three elements are ultimately questions of law," while "[t]he fourth factor-one of causation-is one of fact." *Id*. at 352. If the plaintiff fails to establish any of these elements, his claim fails. "The order of inquiry may vary with the circumstances of the case." *Id*. (quoting *Daniels v. Quinn*, 801 F.2d 687 (4th Cir.1986)).

As an initial matter, no reasonable jury could find that there exists a causal connection between the anonymous letters from 1999 through 2002 (Pl. Dep. at 274-78, 294-95) and the plaintiff's termination, in May 2008 (Def. Ex. O). First, the letters were sent somewhere between 6 and 9 years prior to his termination. This is too remote, as a matter of law. *See Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001); *Robinson v. City of Greenville*, 2004 WL 3262757, at *13 (D.S.C. 2004) (Floyd, J.) (finding "several years" between protected conduct and adverse action insufficient temporal proximity in First Amendment retaliation case). Second, they were ***anonymous***. Which means, by definition, they were unattributable to the plaintiff. And, the plaintiff has not put forward any evidence that the authorship of the letters was, in fact, known, notwithstanding his decision not to sign them.

The plaintiff relies on *Cromer v. Brown*, 88 F.3d 1315 (4th Cir. 1996) to argue that anonymous letters are an appropriate basis for a First Amendment retaliation claim. In fact, the Fourth Circuit, in a qualified immunity context (which did not put causation squarely at issue), simply found that the anonymity of the letters did not destroy a letters "public import." *Id*. at 1326. The court made very little conclusion concerning whether a causal connection could be inferred from an anonymous letter. But, what is clear from *Cromer* and plainly dissimilar from this present case, is that the letter, in *Cromer*, was submitted by a named organization and because almost every black officer was a member of that organization, then there was a reasonable basis to conclude that the defendants might have associated

15

the contents of the letter with any specific individual. *See id.* In other words, the letters were not particularly anonymous.

Here, there are no circumstances that would allow a jury to conclude that the defendants had reason to associate three anonymous letters, submitted years prior, with the plaintiff, at the time of his termination. The plaintiff does not suggest that he was the only black officer, to whom the letter could be attributed. There is no evidence as to the number of black officers who may have been employed by, or who may have left their employ with, the defendants over the many years between the letters and the plaintiff's termination, who might have been potentially perceived as responsible for the letters. There is not even any evidence that the defendants had reason to know that the same individual submitted the various letters. For all these reasons, the plaintiff cannot establish the causal connection element of his retaliation claim as to the anonymous letters.

The only remaining speech for which the defendants could have retaliated was the October 2006 letter to the Employee Relations Branch. The Court would initially consider whether it qualifies as a matter of public concern and hesitantly concludes that it does.

The First Amendment protects government employees from termination or demotion in retaliation for speaking on a matter of public interest. *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir.1998). "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." *Campbell v. Galloway*, 483 F.3d 258, 267 (4th Cir.2007) (quoting *Kirby v. City of Elizabeth City*, 388 F.3d 440, 446 (4th Cir.2004)). Employee statements that merely air "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest" are not entitled to First Amendment protection. *Stroman v. Colleton County School Dist.*, 981 F.2d 152, 156 (4th Cir.1992).

As the Supreme Court has explained, the First Amendment does not shield public employees from the consequences of expressing themselves if their speech was

16

undertaken as part of their official responsibilities. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."); *see also DiMeglio v. Haines*, 45 F.3d 790, 805 (4th Cir.1995) ("Because almost anything that occurs within a public agency could be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee. In making this determination, the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." ) (internal quotations omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Campbell*, 483 F.3d at 267 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

Critically, where complaints concern only the narrow issue of personal employment status, public concern is less likely to be implicated. *See Connick*, 461 U.S. 138, 147-48; *Stroman v. Colleton County School Dist.*, 981 F.2d 152, 156 (4th Cir.1992). Conversely, charges of discrimination against government agencies are more likely to qualify. *See Feldman v. Philadelphia Housing Authority*, 43 F.3d 823, 829 (3d Cir.1994) ("Disclosing corruption, fraud, and illegality in a government agency is a matter of significant public concern."). *Love-Lane v. Martin*, 355 F.3d 766 (4th Cir. 2004) (public schools). The Fourth Circuit has expressly rejected that the analysis turns exclusively on whether or not the individual is complaining about systemic discrimination or simply a personal incident of discrimination. *See Campbell*, 483 F.3d at 268-69. The Fourth Circuit has emphasized the case-specific quality of the analysis. *Id*. at 269. Even still, the undersigned would be inclined to conclude that, generally, statements regarding illegal discriminatory practices by

a state employer against a state agency implicate matters of public concern. *See Connick*, 461 U.S. at 142 (citing *Givhan v. Western Line Consolidated Sch. Dist.*, 439 U.S. 410 (1979)) (teacher's statements concerning school district's alleged policy of racial discrimination involved matter of public concern).

Here, the plaintiff's letter is a sort of hybrid offering. It alleges very personal experiences with discrimination, as well as accuses the defendants of something more far flung and institutional affecting all of the black officers under the Warden's supervision. (Pl. Ex. B at Brown 00178-182.) The Court thinks that the "public or the community is likely to be truly concerned with or interested" in accusations of endemic discrimination in its prisons. *Edwards v. City of Goldsboro*, 178 F.3d 231, 247 (4th Cir.1999). Accordingly, the Court would recommend that the plaintiff's letter be considered protected speech, as a matter of law.

Even still, the claim must fail. The defendants again argue that the plaintiff cannot establish any causal link between the October 2006 letter and his termination in 2009. In order to establish a causal connection, "a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity." *Constantine v. Rectors and Visitors of George Mason,* 411 F.3d 474, 501 (4th Cir. 2005); *see also Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998). "'Knowledge alone, however, does not establish a causal connection' between the protected activity and the adverse action." *Constantine,* 411 F.3d at 501 (quoting *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir.2004)). There must also be some degree of temporal proximity to suggest a causal connection. *Id*. "'A lengthy time lapse between the [public official's] becoming aware of the protected activity and the alleged adverse . . . action . . . negates any inference that a causal connection exists between the two.'" *Id*. (quoting *Dowe*, 145 F.3d at 657.)

Here, there was an approximately nineteen month lapse, from October 10, 2006, the date of the plaintiff's letter until May 20, 2008, the date of his termination letter (Def. Ex. O). In a First Amendment Retaliation case, the Fourth Circuit reemphasized that a 9-month lapse would create a "very close question." *Constantine,* 411 F.3d at 501. A time-period of over twice that length would seem to eliminate temporal proximity as evidence of causation altogether.

The plaintiff complains that there was an intervening trial and substantial delay in the defendants' internal investigation, conducted after the plaintiff was found not guilty. The Court is not sure how these facts rehabilitate the strained temporal proximity between the two events – the letter and the termination. The plaintiff has no actual evidence that the delay was invidious or intended to obscure a retaliatory motive. It was to the plaintiff's benefit to be vindicated at trial. Nonetheless, the defendants' independent investigation revealed other behaviors, previously discussed, that were deemed inappropriate. (See Def. Ex. L.; Warden Dep. at 105-06.) To the extent the plaintiff means to imply that it was proper to consider the trial as somehow having tolled the time to be measured in regards to temporal proximity, it would seem a novel theory. The Court knows of no precedent that would dictate such an outcome. The plaintiff speaks of a totality of circumstances (see Pl. Resp. at 23), apart from evidence of temporal proximity, but the Court does not know to what the plaintiff means to refer. There is no other evidence that the defendants were motivated by the October 2006 letter in their 2008 termination decision.

As a result, the plaintiff cannot establish any causal link between any protected speech and his termination, such that a prima facie case can be established on his First Amendment claim. It should be dismissed. No issues of fact persist.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends that the defendants' motion for summary judgment [Doc. 29] be GRANTED as to all claims pending against them.

IT IS SO RECOMMENDED.

                                                s/Bruce H. Hendricks
                                                United States Magistrate Judge

May 28, 2010
Greenville, South Carolina